**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

WEISBROD MATTEIS & COPLEY PLLC,
1200 New Hampshire Avenue, NW, Ste. 600
Washington, DC 20036

*Plaintiff*,

v.

FEDERAL EMERGENCY MANAGEMENT AGENCY,
500 C Street, SW
Washington, DC 20472

*Defendant*.

Civil Action No. 17-365

**COMPLAINT FOR INJUNCTIVE RELIEF**

1. Weisbrod Matteis & Copley PLLC ("WMC") brings this action to compel disclosure of agency records that the Federal Emergency Management Agency ("FEMA") has withheld in violation of the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 (2012).

**SUMMARY OF ACTION**

2. WMC is a District of Columbia law firm that represents over 1,200 clients whose homes suffered flood damage from Hurricane Sandy ("Sandy"), which struck the east coast of the United States on October 29, 2012. These individuals, who live primarily in New York and New Jersey, purchased flood insurance through the National Flood Insurance Program ("NFIP"). FEMA administers the NFIP with the aid of private insurance companies participating in its Write Your Own ("WYO") program.

3. WMC's clients and more than 140,000 other NFIP policyholders submitted flood insurance claims to FEMA and their respective WYO carriers after their homes sustained flood

damage from Sandy. Approximately 2,000 of those individuals ultimately filed suit on their flood insurance claims in 2013 and 2014. These litigants uncovered significant evidence of misconduct by FEMA's WYO insurers and others working on the agency's behalf that led to the improper denial or underpayment of many Sandy flood insurance claims.

4. *60 Minutes* exposed this evidence on national television in March 2015. Brad Kieserman, then the head of the NFIP, admitted that he personally had seen evidence of this fraud and that FEMA had been aware of "signals" of such misconduct since 2013.

5. To appease Congress and the public, FEMA took the rare step of allowing all 140,000 policyholders who had submitted NFIP insurance claims after Sandy to reopen their claims in the Hurricane Sandy Claims Review ("SCR") process. FEMA presented the SCR as a clean break from the bad practices and personnel that had tainted the initial adjustment of Sandy flood insurance claims and as the government's best effort to set things right for the thousands who have been underpaid and mistreated by FEMA's agents. FEMA promised its policyholders, members of Congress, and the public generally that the agency was taking direct control and would provide a quick, fair process designed to ensure that those who had purchased flood insurance from the federal government received every penny they were owed.

6. FEMA has lied to its policyholders and to all taxpayers. The SCR has become a boondoggle designed to overpay FEMA's contractors while continuing deliberately to underpay homeowners. FEMA's ongoing misconduct and improprieties include but are not limited to:

a) Retaining SCR staff involved in the original, tainted adjustment of Sandy flood claims despite promising not to do so;

b) Engaging in inaccurate and one-sided training of purportedly "neutral" JAMS reviewers;

c) Failing to conduct proper, line-by-line assessments of SCR claims to identify the true value of covered flood damage and relying instead on a program developed by McKinsey & Company ("McKinsey") that proposes unjustifiable lowball payments;

d) Instructing SCR staff categorically to deny payments for certain categories of covered flood damage; and

e) Making exorbitant payments to unqualified contractors with ties to FEMA officials to administer the SCR.

7. Contrary to FEMA's promise to resolve all SCR claims fairly in ninety days or less, the SCR already has dragged on for nearly two years, with no end in sight. Fewer than 150 of WMC's 1,200 clients have resolved their claims, and far fewer actually have received payment from FEMA. Upon information and belief, FEMA's combination of delay and deliberate underpayment has resulted in aggregated payments of more than $500 million to federal contractors while homeowners received less than $200 million during the same period.

8. WMC submitted FOIA requests on January 6 and February 9, 2016, to unearth documents concerning these troubling aspects of the SCR. FEMA has failed to respond or even to acknowledge these requests for more than a year, violating its obligations under FOIA and the public policies and interests underlying that statute.

9. Given the significant public interest in assessing the integrity and cost of FEMA's ongoing SCR process, WMC seeks expedited treatment of this case under 28 U.S.C. § 1657.

**JURISDICTION AND VENUE**

10. This Court has jurisdiction over this action and over FEMA pursuant to 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1331.

11. Venue is proper in this Court pursuant to 5 U.S.C. § 552(a)(4)(B).

## PARTIES

12. WMC is a law firm headquartered and registered as a professional limited liability company in the District of Columbia. WMC was founded in 2011 and represents plaintiffs in various complex civil litigation matters, including insurance coverage disputes. WMC presently represents more than 1,200 New York and New Jersey residents who filed claims on NFIP flood insurance policies after Sandy and who are obtaining review of those claims through the SCR.

13. FEMA is an agency within the meaning of 5 U.S.C. § 552(e) and is a subcomponent of the United States Department of Homeland Security ("DHS"), a cabinet-level executive department of the United States Government. FEMA's responsibilities include administering the NFIP, which provides federally-underwritten and subsidized flood insurance to millions of Americans.

## STATEMENT OF FACTS

### I. FEMA created the SCR to redress systemic fraud in the handling of NFIP claims following Sandy.

14. Congress created the NFIP in 1968 to provide a unified national plan for floodplain management and to offer federally-subsidized flood insurance to the public, since flood coverage had become uneconomical for private insurance companies to sell. Today the NFIP provides coverage for more than 5 million homes and businesses across the country and has more than $1.2 trillion in aggregate coverage in force.

15. The federal government underwrites NFIP insurance policies and ultimately pays all claims on those policies, but Congress directed that private industry should administer the program as much as possible. FEMA has fulfilled this mandate since 1983 by allowing dozens of private insurance companies to issue NFIP policies on its behalf through the agency's WYO

program. WYO insurers act as FEMA's fiduciaries and can issue policies, collect premiums, adjust claims, and pay losses on the government's behalf with federal dollars, in exchange for which the insurers receive an administrative fee.

16. A majority of NFIP policyholders obtain coverage through these WYO insurers, though some buy directly from FEMA through the agency's NFIP Direct program. The NFIP policy terms and premiums remain the same regardless of which entity actually issues the policy, and FEMA retains ultimate responsibility for paying claims on all NFIP policies.

17. Sandy made landfall on October 29, 2012, devastating communities along the East Coast, especially in New York and New Jersey. Sandy became the deadliest and most destructive hurricane of the 2012 Atlantic hurricane season and the second most costly hurricane in United States history, with aggregate damage estimates exceeding $50 billion.

18. More than 140,000 NFIP policyholders filed insurance claims for flood damage caused by Sandy. Some of those policyholders ultimately filed lawsuits in federal court, alleging that FEMA or its WYO insurers had denied or underpaid their claims improperly.

19. Those lawsuits uncovered shocking evidence that WYO insurers, third-party claims adjusters, engineering firms, and others working on FEMA's behalf had fraudulently denied or underpaid many Sandy flood claims.

20. CBS's *60 Minutes* aired an exposé on March 1, 2015, describing extensive misconduct both in engineering analyses and in other aspects of FEMA's Sandy NFIP claims adjustment process.

21. Brad Kieserman, then FEMA's Deputy Associate Director for Federal Insurance and head of the NFIP, appeared on that *60 Minutes* program for FEMA. Mr. Kieserman acknowledged evidence, for example, of fraudulent engineering reports that were used to deny or

underpay NFIP claims after Sandy. Mr. Kieserman said, "I'm not gonna sit here and conceal the fact that it happened. 'Cause in the last three weeks, I've seen evidence of it." Mr. Kieserman also said that the agency had failed to exercise sufficient oversight of its agents in their review of Sandy NFIP claims. Mr. Kieserman also admitted that FEMA had seen "signals" of such misconduct as early as 2013.

22. Mr. Kieserman reiterated these statements in subsequent Congressional testimony. He acknowledged that plaintiffs litigating NFIP insurance claims arising from Sandy flood damage had presented evidence that:

> 1) engineering companies pressured field engineers to find that damage was not caused by flood, resulting in undervalued claims; 2) engineering companies changed field engineer reports in a peer review process without the field engineer's knowledge and then forwarded the reports to the WYO companies and FEMA's Direct Side Agent [*i.e.*, NFIP Direct] as the work of the engineer; 3) engineering companies cut and pasted signatures and license seals resulting in falsified reports being sent to the WYO company and FEMA; and 4) engineering companies employed unlicensed engineers.

23. U.S. Forensic, LLC ("USF"), and HiRise Engineering, P.C. ("HiRise"), became especially notorious for their role in this misconduct. State attorneys general have investigated both firms in connection with their work on FEMA's Sandy NFIP claims.

24. A federal magistrate judge adjudicating one such insurance claim decried "reprehensible gamesmanship by a professional engineering company [USF] that unjustly frustrated efforts by two homeowners to get fair consideration of their claims. Worse yet, evidence suggests that these unprincipled practices may be widespread." The court subsequently sanctioned FEMA's WYO insurer for attempting to conceal evidence of USF's fraud.

25. The New York attorney general's staff raided HiRise's offices in February 2015 in connection with its criminal investigation and indicted both the company and lead engineer Matthew Pappalardo in August 2016. The indictment included fifty felony counts relating to

HiRise and Mr. Pappalardo's work reviewing Sandy flood claims for FEMA. HiRise and Mr. Pappalardo pled guilty to criminal solicitation and unauthorized practice of engineering, respectively, in January 2017.

26. The DHS Office of Inspector General published a report in March 2016 agreeing that FEMA did not exercise adequate oversight of the WYO program. That report concluded that "FEMA is unable to ensure that WYO companies are properly implementing the NFIP and is unable to identify systemic problems in the program."

27. FEMA announced the creation of an NFIP Transformation Task Force in response to these revelations of systemic fraud and other misconduct in the adjustment of Sandy NFIP claims and the WYO program more generally. The task force's efforts included both reform of the NFIP itself and efforts to redress the harm suffered specifically by Sandy victims whose NFIP claims FEMA wrongfully had denied or underpaid.

28. FEMA announced aggressive efforts to settle the remaining Sandy NFIP claims in litigation and created the SCR for those NFIP policyholders who had never chosen to litigate their Sandy flood insurance claims.

29. FEMA implemented the SCR by sending notices to all of the more than 140,000 Sandy victims who had filed NFIP flood claims. Any of those policyholders who had not previously litigated their Sandy claims could opt into the program to reopen their claims and receive an additional review to identify any improper underpayments.

30. FEMA made many promises to members of Congress and the public that the SCR would deliver a fair and efficient process to redress the harm suffered by wrongfully denied and underpaid NFIP policyholders after Sandy.

31. For example, FEMA promised that the SCR would hire claims adjusters and other staff uninvolved with the original, tainted assessment of Sandy NFIP insurance claims. FEMA promised specifically that it would not retain any engineers affiliated with suspect firms like USF and HiRise.

32. FEMA also promised that it would resolve its policyholders' claims quickly through the SCR. For example, it represented that it would obtain a copy of the original WYO insurer's claim file within two days of receiving a policyholder's request to reopen his claim and that a FEMA claims adjuster would complete the review within ninety days thereafter.

33. To help restore confidence in the impartiality and fairness of its assessments, FEMA promised that the SCR would permit policyholders to appeal claims adjusters' findings to an independent, neutral reviewer. FEMA contracted with JAMS, an alternative dispute resolution service with a national reputation, to provide these neutral reviewers for the SCR.

34. Most importantly, FEMA promised and continues to promise that the SCR's overriding goal is to ensure that NFIP policyholders receive every penny owed on their Sandy flood insurance claims and that SCR staff would conduct thorough, line-by-line assessments of each insurance claim to meet that objective.

## II. FEMA's administration of the SCR program has been fraught with procedural and substantive problems, which have continued to harm FEMA's policyholders while providing a boondoggle for its contractors.

35. The SCR unfortunately has not lived up to FEMA's promises. It has suffered from chronic, pervasive, and continuing procedural and substantive problems.

### A. The SCR staff is plagued by conflicts of interest.

36. For example and contrary to FEMA's original representations, many SCR case workers were involved with the original, tainted adjustment of Sandy flood insurance claims in 2012 and 2013. These case workers have a fundamental conflict of interest in the SCR and a

great incentive to affirm the quality of the prior, fraudulent work in which they themselves were involved.

37. In one particularly egregious instance, FEMA case worker Rick Watson conducted an SCR review of an insurance claim for which his own supervisor, Robert Brooks, had performed the original claims adjustment in 2013. Mr. Watson had every incentive to rubber stamp his own boss's work irrespective of the claim's actual merits, particularly when Mr. Brooks himself was required to review and sign off on all of Mr. Watson's work in the SCR.

38. FEMA even has retained in-house engineers, such as David Zimpel and Joseph Kamanda, who reviewed NFIP claims for USF and other suspect engineering firms after Hurricane Sandy. In one case, Mr. Zimpel conducted an SCR review of his *own* original 2013 engineering report on an NFIP claim, a self-evident conflict of interest.

39. In addition to these troubling conflicts of interest, FEMA staff frequently have compromised the integrity of the JAMS neutral review process by engaging in unilateral and inaccurate "training" of JAMS reviewers, conducting improper *ex parte* conversations with JAMS reviewers about pending claims, pressuring JAMS reviewers to revise their written findings to conform to FEMA's preferences, and refusing to finalize or delaying the finalization of JAMS recommendations with which FEMA disagrees.

40. In one case, a policyholder represented by WMC requested neutral review on July 20, 2015, but did not receive a final decision on his claim from FEMA for more than a year afterward, during which time FEMA personnel repeatedly berated the supposedly "neutral" JAMS reviewer to revise her payment recommendation. By contrast, when the JAMS neutral reviewers issue recommendations favorable to FEMA, FEMA staff frequently finalize them within a couple business days.

**B. The SCR underpays NFIP policyholders deliberately and systematically.**

41. Former SCR staff members have reported that FEMA is not conducting the thorough, line-by-line adjustments of each insurance claim that it promised, but rather has designed the SCR deliberately to continue underpaying NFIP policyholders. One such individual appeared at an April 2016 press conference alongside United States Congressman Tom MacArthur and described how he had been forced to underpay hundreds of homeowner insurance claims in the SCR.

42. FEMA retained McKinsey as consultants to the SCR. McKinsey employees worked closely with FEMA employees, including Anthony "Dan" Thorne to develop a complex spreadsheet that SCR staff refer to variously as the "job aid," "damage review tool," and in subsequent iterations, the "mega tool."

43. This McKinsey tool prompts the SCR case worker to enter various data from a policyholder's original Sandy claim (*e.g.*, policy number, deductible, and original claim payment), but its critical inputs are the square footage of the property's main level and its approximate value per square foot, on which SCR staff frequently have only approximations or are instructed to estimate. The McKinsey tool translates this square footage and valuation data into upper and lower bound estimates of the cost to repair Sandy flood damage to the property. The algorithm that the program uses to make these calculations is invisible to and uncontrolled by the user, and upon information and belief, FEMA management has never explained it to SCR staff.

44. The McKinsey program does not calculate the actual value of a property's Sandy flood damage. It merely makes an estimate based on very general factors that have little to do

with the proper assessment of an insurance claim and appears designed to generate payment thresholds far below a claim's actual value.

45. SCR case workers prepare more detailed damage estimates to submit to the policyholder after using the McKinsey program to generate upper and lower payment thresholds. FEMA has instructed the reviewers, however, that these detailed estimates must fall within the bounds set by the McKinsey tool, even if the reviewer identifies additional flood damage covered by FEMA's insurance policy. Supervisors routinely refuse to approve any payment recommendations inconsistent with the predictions made by the McKinsey threshold generator, irrespective of the claim's actual merits.

46. Because FEMA forbids SCR staff from using their expertise and judgment and allows them to deviate above the McKinsey thresholds only in exceptionally rare cases, SCR case workers' "itemized" damage estimates usually are superficial and inadequate. These estimates typically account for corrections to the sales tax paid on flood repairs, standardized correction to labor and material pricing, and a handful of items that the case worker identifies as either omitted from or paid incorrectly on the original claim. Even these omitted items usually are isolated examples drawn from FEMA lists of preapproved "omitted" items rather than a comprehensive account of missing and underpaid repair costs. The resulting product sent to the policyholder gives the appearance of being a comprehensive analysis of the damage but in reality reflects a cursory review of the available material and simply provides documentary justification for a payment in the McKinsey threshold range, irrespective of the claim's actual merits.

47. Indeed, memoranda issued by FEMA said explicitly that the McKinsey program's purpose was to expedite file review. It did so not by speeding up the proper, comprehensive evaluation of a claim's merits, but rather by predetermining for each claim approximately what

FEMA would pay, regardless of the claim's merits. SCR staff simply had to provide documentation to justify the McKinsey program's predictions for the policyholders' benefit.

48. In addition to using the improper McKinsey threshold generator in lieu of proper, line-by-line damage adjustments, FEMA has instructed SCR case workers categorically to refuse payment for the replacement of various items covered by FEMA's NFIP insurance policies, such as flood-damaged exterior siding. These improper, categorical denials further reduce the amount paid to SCR participants.

### C. FEMA's contractors have profited immensely from the SCR while many policyholders remain underpaid.

49. At the same time FEMA has continued to underpay its policyholders, whistleblowers indicated that the SCR has been a boondoggle for FEMA reserve staff and contractors, who are paid on a daily rate and have financial incentive to draw out the process as long as possible, to the detriment of FEMA's NFIP policyholders.

50. FEMA retained Optimal Solutions & Technologies, Inc. ("OST"), as the primary contractor responsible for handling the SCR's operational work. OST in turn retained more than a dozen independent claims adjusting firms that supplied the bulk of the SCR's case workers, including several firms that were involved in the original, tainted adjustment of Sandy NFIP claims in 2012 and 2013.

51. Upon information and belief, OST has no prior expertise or experience adjusting insurance claims. Its prior work with FEMA involved information technology services.

52. OST's past work as a government IT contractor raised serious ethical concerns. A 2010 report by the DHS Office of Inspector General noted that "[t]he misplaced allegiances of key [FEMA] employees hampered the performance of [the] contractors. A former OST employee was chosen by FEMA to oversee OST's contract performance." The report

recommended further regular ethics training for FEMA personnel as a result. Similar concerns have arisen about OST's present contract to administer the SCR.

53. The primary link between FEMA and OST appears to be David Maurstad, who ran the NFIP from 2004 to approximately 2008 and who, upon information and belief, gave OST its previous FEMA contract in a no-bid award. Mr. Maurstad also was sued during his previous tenure at FEMA for systematically underpaying NFIP insurance claims after 2003's Hurricane Isabel. He joined OST as a senior executive from 2011 to 2016, during which time the company obtained its current SCR contract, and then returned to FEMA in January 2016 as the agency's Assistant Administrator for Federal Insurance, in which capacity he oversees OST's performance on that contract.

54. Mr. Maurstad's self-evident conflict of interest has raised serious concerns about his ability to oversee OST's performance objectively.

55. Other FEMA employees have conceded that OST has done a terrible job managing the SCR, describing the process as inefficient, disorganized, and expensive.

56. Many of the case workers retained by OST to administer the SCR lack appropriate training and experience and frequently have conducted superficial or inadequate reviews of Sandy flood insurance claims. Others have obvious conflicts of interest, as discussed above.

57. Robert Brooks, who served for many months as a supervisor of all SCR claims in which policyholders had retained counsel, is a particularly poignant example. Mr. Brooks is a former attorney who was disbarred in multiple states for stealing his clients' insurance proceeds, a charge that he admitted and for which he was subject to criminal prosecution. WMC notified

FEMA's Office of Chief Counsel of these facts as early as January 2016, yet he continued to serve as the primary supervisor of thousands of SCR claims for many months thereafter.

58. Yet FEMA has been paying OST $2,500 per day for each case worker staffed to the SCR. The number of case workers has fluctuated over the past two years but frequently exceeded 200 on any given day. Many SCR staff work six or even seven days per week.

59. Thus, FEMA has paid OST approximately $500,000 per day or more to administer the SCR since approximately May 2015. Upon information and belief, the aggregate total paid to OST and other contractors working on the SCR exceeds $500 million. This amount dwarfs the payments made to policyholders through the SCR process, which as of February 10 2017, the date of FEMA's most recent publication of such statistics, is less than $200 million.

## WMC'S FOIA REQUESTS

60. WMC represents more than 1,200 policyholders in the SCR process and on information and belief represents more SCR participants than any other entity. WMC has seen myriad documents and other evidence corroborating the foregoing statements during the course of its work for these SCR participants.

61. WMC submitted FOIA requests in connection with FEMA's SCR program on January 6 and February 9, 2016. These requests sought various documents concerning the SCR program and the matters described in the preceding section, including records pertaining to FEMA's organization of the review process, the instructions and guidelines governing the review of insurance claims, and FEMA's relationships with its SCR contractors. WMC has attached copies of those requests to this Complaint as Exhibits A and B, respectively. FEMA never responded to or even acknowledged receipt of either of WMC's FOIA requests.

**COUNT I**
**(Violation of FOIA, 5 U.S.C. § 552(a)(3))**

62. WMC re-alleges, adopts, and incorporates by reference the foregoing allegations as if fully set forth herein.

63. An agency must make a determination on a FOIA request within twenty working days after receipt and "shall immediately notify the person making such request of such determination and the reasons therefore." 5 U.S.C. § 552(a)(6)(A)(i). An agency may extend this deadline by ten working days in "unusual circumstances." *Id.* § 552(a)(6)(B)(i).

64. FEMA has failed to make any determination on or even to acknowledge WMC's requests for more than a year, far longer than the period permitted by FOIA. Accordingly, WMC is "deemed to have exhausted [its] administrative remedies with respect to [its] request." *Id.* § 552(a)(6)(C)(i).

65. FEMA has wrongfully withheld the requested records, to which WMC has a legal right of access under 5 U.S.C. § 552(a)(3). There is no legal basis for FEMA's failure to comply with 5 U.S.C. §§ 552(a)(6)(A)(i) and (a)(6)(B) and with 44 C.F.R. §§ 5.52, 54, and/or 56, nor is there any lawful argument that FOIA's exemptions completely preclude the production of any requested records.

**PRAYER FOR RELIEF**

WHEREFORE, WMC respectfully requests that this Court:

A. Expedite consideration of this case pursuant to 28 U.S.C. § 1657;

B. Enjoin FEMA from withholding the documents requested by WMC on January 6 and February 9, 2016, and order the production of those documents pursuant to 5 U.S.C. § 552(a)(4)(B);

C. Award WMC reasonable attorneys' fees and other litigation costs incurred in this action pursuant to 5 U.S.C. § 552(a)(4)(E)(i); and

D. Award any other relief that the Court may deem just and proper.

Respectfully submitted,

February 28, 2017

August J. Matteis, Jr. (Bar No. 433068)
Matthew S. Krauss (Bar No. 996106)
Joshua B. Katz (admission pending)
WEISBROD MATTEIS & COPLEY PLLC
1200 New Hampshire Ave., NW, Ste. 600
Washington, DC 20036
(202) 499-7900
amatteis@wmclaw.com
mkrauss@wmclaw.com
jkatz@wmclaw.com

*Counsel for Plaintiff*